**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JILL MARIE PENC,**

      **Plaintiff,**     **1:10-cv-517**
                **(GLS/DRH)**

    **v.**

**NEW YORK STATE DEPARTMENT OF**
**TAXATION AND FINANCE; CSEA TAX**
**LOCAL 1000;** and **CSEA TAX LOCAL 690,**

      **Defendants.**
_____
**APPEARANCES:**     **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Jill Marie Penc
Pro Se
203 Clement Avenue, Apt. 4
Schenectady, NY 12304

**FOR THE DEFENDANTS:**
*New York State Department of*
*Taxation and Finance*
HON. ERIC T. SCHNEIDERMAN  JUSTIN C. LEVIN
New York State Attorney General  Assistant Attorney General
The Capitol
Albany, NY 12224

*CSEA Tax Locals 1000 and 690*
Civil Service Employees Association, Inc. STEVEN A. CRAIN, ESQ.
P.O. Box 7125, Capitol Station
143 Washington Avenue
Albany, NY 12224

**Gary L. Sharpe**

**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pro se plaintiff Jill Marie Penc commenced this action against defendants New York State Department of Taxation and Finance and CSEA Tax Locals 1000 and 690, alleging violations of the Americans with Disabilities Act (ADA),[1] and a breach of CSEA defendants' duty of fair representation. (*See* Compl., Dkt. No. 1.) Penc also alleges violations of her due process rights pursuant to 42 U.S.C. § 1983, and claims for defamation under New York State law. (*See id.*) Pending are defendants' motions to dismiss Penc's complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6). (Dkt. Nos. 15, 18.) For the reasons that follow, the motions are granted.

### II. Background

**A.    Factual History**

At all times relevant, pro se plaintiff Jill Marie Penc was employed as a "receptionist" by the New York State Department of Taxation and Finance

---

[1]42 U.S.C. § 12101, *et seq.*

(the Department) at the Wade Road Tax Files Storage Facility in Latham, New York. (*See* Compl. at 8, ¶¶ 1, 4, Dkt. No. 1.)[2] As a receptionist, Penc's primary duty was to insure the security of New York State's tax files and some Internal Revenue Service tax files. (*See id.* at 8, ¶ 8.)

Penc alleges that she suffers from major depression and obsessive compulsive disorder. (*See id.* at 2, ¶ 4.) She states that she has been under "the regular, bi-monthly" care of a psychologist since May 2003.[3] (*See id.* at 10, ¶ 27.) Because of her illness, Penc voluntarily checked herself into Ellis Hospital in June 2003. (*See id.* at 11, ¶ 34.) After her discharge from the hospital two weeks later, the Department required Penc to see a psychiatrist of its choosing. (*See id.* at 11, ¶ 36.) The Department's chosen psychiatrist determined that Penc was able to return to work with no special accommodations. (*See id.* at 11, ¶ 37.) Thus, Penc returned to work "under the same circumstances as prior to [her] extended absence of 2003." (*Id.* at 11, ¶ 38.) In addition, Penc did not

---

[2]Penc's complaint contains multiple paragraphs labeled with the same or similar numbering. For ease of reference, when referring to the complaint, the court will cite to the page number assigned by the CM/ECF system and the paragraph number on that page.

[3]In her response to defendants' motions, Penc states that her initial statement that she was under "bi-monthly" care was an "inaccurate ... misrepresentation of the term 'bi-monthly,'" as she "intended the meaning as EVERY 2 MONTHS not twice a month." (Pl. Resp. Mem. of Law at 3, Dkt. No. 16.)

request any special accommodations from the Department upon her return. (*See id.* at 11, ¶ 39.)

In September 2007, Penc voiced concerns to Barbara Billett, the Department's Acting Commissioner, and the Department of Civil Service Suggestion Committee, regarding purported "Security Breaches in the Wade Road Tax Files." (*See, e.g.*, *id.* at 16-20, ¶¶ 109-12, 117-19, 124-25, 134-36, 143.) Penc alleges that Department "Management" treated her unfairly "in retaliation for reporting" the security issues. (*See, e.g.*, *id.*) While the precise basis of this claim is not at all clear, it appears that the retaliatory treatment referenced relates to Penc's allegations that Judith Milack, one of Penc's immediate supervisors, made unspecified "'false' allegations" against Penc; that another of Penc's immediate supervisors, Paul Skibinski, "chang[ed] the receptionist duties definition without prior approval from Labor Relations and request[ed] that [a]ll receptionists sign a notice of the changes"; and that Penc experienced the suspicious loss of certain emails. (*See id.* at 18, 20, ¶¶ 128, 129, 150.)

On October 10, 2007, Penc expressed to her CSEA union representative, Mike Gifford, that she believed "something was up." (*See id.* at 21, ¶ 164.) Later that day, Ms. Milack "threw an envelope at [Penc]

4

and walked away." (*Id.* at 21, ¶ 177.)  The letter in the envelope

stated that Penc was the subject of an October 12, 2007 "interrogation"

with respect to certain disciplinary charges.  (*See id.* at 21, ¶ 178.)  Shortly

after Penc received the letter, she was escorted out of the building.  (*See*

*id.* at 21, ¶ 179.)

Penc attended the October 12 "interrogation" with her CSEA

representatives, Mike Gifford and Lois Biette.  (*See id.* at 21, ¶ 181.)  Penc

describes the interrogation as having been "highly exagerrated [sic],

slanderous, and defamatory towards [her]."  (*Id.* at 21, ¶ 182.)  According to

Penc, "[a]lthough [it was] not one of the alleged charges," she was asked

by Labor Relations representatives Kathy Nealon and Marge Abdou "what

business it was of [hers] to report security breaches," and "if [she] was

looking for attention."  (*Id.* at 21, ¶¶ 182, 184.)  Penc contends that Mr.

Gifford and Ms. Biette "did little to prevent [Ms.] Abdou and [Ms.] Nealon

from verbally assaulting [and] attacking [her]."  (*See id.* at 21-22, ¶ 188.)

Penc further alleges that "it became apparent to [her] ... that [Ms.] Abdou

and [Ms.] Nealon were attempting to 'break [her].'"  (*Id.* at 22, ¶ 193.)  And

without explanation, Penc claims that she "began to get the feeling that

[her] past 'mental history' was being held against [her]."  (*Id.*)

Following the interrogation, on October 24, Penc received a "notice of discipline" (NOD) and was placed on leave without pay.  (*See id.* at 23, ¶194.)  The NOD "recommended a proposal of a four week suspension without pay."  (*Id.* at 23, ¶ 195.)  Mr. Gifford suggested that Penc accept the proposal, and stated that "he would 'be with [her] all the way' ... if [she] was not single and had another means of support."  (*Id.* at 23, ¶¶ 197-98.)  Penc did not accept the proposal.  Rather, on October 26, she filed a grievance with her union denying all charges and requesting "that a hearing be expedited since [she] was suspended [without pay]."  (*See id.* at 23, ¶ 199.)

Penc was assigned CSEA attorney Daren Rylewicz to represent her in the grievance proceedings.  (*See id.* at 24, ¶ 201.)  Penc contends that, "[a]lthough [she] cited [her] right to a timely hearing per the CSEA contract[,] Mr. Rylewicz stated 'we never go by that.'" (*Id.* at 24, ¶ 202.)  "Fe[eling] uneasy that Mr. Rylewicz was not allowing [her] the expedited hearing per the CSEA contract ... [Penc] requested a different attorney through e-mail to Nancy Hoffman, CSEA attorney."  (*Id.* at 24, ¶ 203.)  Penc's request was denied.  (*See id.* at 24, ¶ 204.)

As of October 30, "[Penc] was officially 'off the payroll' as [she] had

used up all of her accruels [sic]." (*Id.* at 24, ¶ 204.)  Penc "continued to

pressure Mr. Rylewicz into allowing [her her] due process as the 30 day

time limit came and went." (*Id.* at 24, ¶ 205.)  According to Penc, "Mr.

Rylewicz's response was 'this has never happened before.'" (*Id.* at 24, ¶

206.)  Ultimately, in December 2007, Penc was reinstated to her original

position, received all her back pay, "but continued to not be allowed a

hearing." (*Id.* at 24, ¶¶ 208-09.)

Upon her return to work, Ms. Milack informed Penc that she would be

working alone "for now." (*See id.* at 24, ¶ 211.)  In addition to "being

isolated from [other] Wade Road Receptionists[, Penc] was scolded by Ms.

Milack for looking at a sales flier as [her] reading privileges had been taken

away." (*Id.* at 24-25, ¶ 216.)  Penc contends that "[w]ith numerous

cancellations of [her] proposed and long overdue right to [her] due

process[, she] felt [she] was being 'punished' for 'alleged' allegations that

were still not proven." (*Id.* at 24, ¶ 218.)

In November 2008, Penc filed a complaint with the New York State

Division of Human Rights, the basis or details of which is not in any way

explained in Penc's pleading or responsive submissions. (*See id.* at 26, ¶

234.)  Then, in June 2008, for reasons largely unexplained in the

complaint, Penc received a second notice of discipline.  (*See id.* at 30, ¶ 317.)  With respect to this notice of discipline, Penc states that "as she was signing into work [one] morning [she was provoked by [a] co-worker"; that another coworker "got involved in the matter and set [her] up"; and that despite emailing a supervisor her side of the story, she was "instructed to collect [her] things and leave the workplace."  (*Id.* at 28, ¶¶ 263-66, 272.) In connection with this incident, Ms. Abdou left multiple voicemail messages for Penc, directing her to call back to schedule an appointment for an "interrogation."  (*See id.* at 28-29, ¶¶ 278, 301-02.)  In response, Penc contacted Mr. Rylewicz, her CSEA attorney, "expressing [her] right to have a letter sent to [her] with time and place for an interrogation and requesting that all communication from Ms. Abdou be directed to him."  (*Id.* at 28-29, ¶ 299.)  "Mr Rylewicz agreed and told [Penc] that a letter would be sent to [her]."  (*Id.* at 29, ¶ 300.)

As of June 24, having "used up her accruels [sic]," Penc was again on leave without pay, this time in connection with the second notice of discipline.  (*See id.* at 30, ¶¶ 317-20.)  At some point thereafter, Penc applied for unemployment insurance through the New York State Department of Labor (DOL).  (*See id.* at 29, ¶ 303.)  On July 21, Penc

received a call from DOL representative Beth Coulson in connection with the application. (*See id.* at 29, ¶ 304.) According to Penc, "it became apparent ... that Ms. Coulson had already spoken to someone from the Tax Department" because "Ms. Coulson began to verbally bash her over the phone making statements such as 'oh I get it everybody is against you' and 'do you think this is a conspiracy,'" thereby "inferring that [she] was a psycho." (*Id.* at 29, ¶ 305.) Penc claims she "sensed that a red flag was raised regarding [her] past to a total stranger." (*Id.* at 29, ¶ 307.) Ms. Coulson called Penc the next morning, apologized for her behavior, and offered to reinstate Penc's case. (*See id.* at 29, ¶¶ 310-11.) Penc declined Ms. Coulson's offer. (*See id.* at 29, ¶¶ 312-13.) On July 23, Penc received a letter from Ms. Coulson rejecting her claim. (*See id.* at 29, ¶¶ 312-13.) According to Penc, the reasons given for denial of the claim were "precisely the 'alleged' allegations against her." (*Id.* at 29, ¶ 314.)

A week later, on July 29, 2008, a hearing related to Penc's October 2007 NOD was commenced, during which Penc continued to be represented by Mr. Rylewicz. (*See id.* at 30, ¶ 316.) According to Penc, during the hearing, "Mr. Rylewicz 'bashed' the testimony of all of those testifying against [Penc]." (*Id.* at 30, ¶ 323.) Penc "felt more positive in

9

regards to Mr. Rylewicz's actions observing him in the hearing and began to trust that he had [her] best interests in mind."  (*Id.* at 30, ¶ 324.) Ultimately, "[t]he hearing wrapped up on September 2, 2008 with many of the charges dropped during the closing arguments."  (*Id.* at 30, ¶ 325.)

On August 12, Penc met with CSEA officials, including CSEA Local Tax President Danny Donahue, at CSEA headquarters to "present[] violations of [her] contract rights."  (*Id.* at 27, ¶ 256.)  According to Penc, "while presenting [the] violations ... it seemed as though Mr. Donahue was 'looking right through [her].'"  (*Id.* at 27, ¶ 260.)  Once the meeting was over, Penc claims "[she] never heard anything from anyone in attendance at the meeting regarding the violations of the CSEA contract."  (*Id.* at 27, ¶ 261.)

On September 17, Penc met with Mr. Rylewicz to discuss the allegations made against her in the second notice of discipline.  (*See id.* at 30, ¶¶ 326-27.)  At the meeting, Mr. Rylewicz advised Penc that "he had [a] 'deal too good to be true.'"  (*Id.* at 30, ¶ 328.)  As part of the "deal" or settlement offer, all disciplinary charges would be dropped and "Penc would begin a new job at the Department on September 29.  (*See id.* at 31, ¶ 341.)  According to Penc, Mr. Rylewicz informed her that if she did not

accept the deal, she would be off the payroll until at least December 2008.
(*See id.* at 30, ¶ 331.)  Penc accepted the settlement, but, pointing to
physical, mental, and financial hardships she was suffering at the time,
claims that she did so "reluctantly, and under desperation and extreme
duress by Mr. Rylewicz." (*See id.* at 31, ¶ 332-39.)  The next day, "[Penc]
received a call from Mr. Rylewicz congratulating [her] of being 'vindicated'
of ALL charges." (*Id.* at 31, ¶ 346.)  According to Penc, in response to
questions related to the settlement stipulations, Mr. Rylewicz stated that
they "were put in place for Labor Relations to 'save face.'" (*See id.* at 31, ¶
347.)  The following day, Penc asked Mr. Rylewicz to revoke the
agreement, but Mr. Rylewicz told her it was too late.  (*See id.* at 31, ¶¶ 350-
51.)

On September 29, the day Penc was to begin her new job, Penc
attended an appointment with her psychiatrist instead of reporting to work.
(*See id.* at 32, ¶ 356.)  Penc's psychiatrist issued her a letter putting her on
sick leave.  (*Id.* at ¶ 359.)  According to Penc, she was "not be able to
focus on a new job so soon," since she had to "straighten out everything
that had been compromised while [she was] on [leave without pay.]"  (*Id.* at
31-32, ¶¶ 352-56.)

After "no longer feeling the need for Mr. Rylewicz's services," Penc had Mr. Rylewicz send her case file to her. (*See id.* 33, ¶ 368.) According to Penc, the file contained "daming [sic] and slanderous statements regarding [her] submitted to the Tax Labor Relations in October 2007." (*Id.* at 3, ¶ 370.) In that regard, Penc points to statements of a coworker who "mentioned [Penc's] suicide attempts in May 2003 stating that she feared [Penc] for all of the [y]ears [they] worked together." (*Id.* at 33, ¶ 371.) Penc also points to a statement in which Ms. Milack "mention[ed] [the] suicide attempts," "stated that she feared that [Penc] would harm her or her family," and mentioned that one of Penc's coworkers "told his Mother that if he turned up missing that she would know where to look referring to me doing him harm." (*Id.* at 33, ¶¶ 372-73.) Implying the inaccuracy of these statements, Penc asserts that "after returning back to work in 2004, [she] was never labeled 'violent' until October 2008," and that "[t]hroughout [her] 29+ years of stellar NYS Service [she] was never accused of being a threat to anyone in the workplace." (*Id.* at 33, ¶¶ 377-78.)

Penc never reported for her new job and remains on sick leave at half pay. (*See id.* at 33, ¶ 379.)

**B.    Procedural History**

12

On May 3, 2010, seeking monetary damages, Penc commenced the present action against the Department and CSEA Tax Locals 690 and 1000. (*See* Compl., Dkt. No. 1.)  As against the Department, Penc alleges a claim of retaliation under the ADA, and further asserts that the Department deprived her of due process in connection with her disciplinary hearings; "violat[ed] ... the tax codes of conduct"; "used [her] 'disability' in an attempt to defame [her] character";  and "defam[ed] her character." (*Id.* at 3, 5, ¶¶ 1A-7A.)

As against the CSEA defendants, Penc alleges that "[she] was ignored when [citing] CSEA contract violations to [them]"; that "no remedies or actions were sought" in that regard; that "CSEA Reps fail[ed] to represent [her] when [she] refused plea deal"; and that "CSEA Reps ignor[ed her] after she refused a deal." (*Id.* at 6-7, ¶¶ 1B-2C.)  Penc further alleges a "violation of [her] expeditious right to due process," and that the CSEA engaged in a "plot ... to isolate her in the cafeteria reception booth beginning 12/17/2008 - June 4, 2008." (*Id.* at 7, ¶¶ 3C-4C.)  Defendants have moved to dismiss Penc's complaint in its entirety pursuant to Rules 12(b)(1) and (6).  (*See* Dkt. Nos. 15, 18.)

### III. Standard of Review

The standards for judgment pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) are well established and will not be repeated here.  For a full discussion of the standards, the court refers the parties to its previous opinions in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 217-18 (N.D.N.Y. 2010) (Rule 12(b)(6)), and *Hunt v. United States*, No. 1:07-CV-0112, 2007 WL 2406912, at *1 (N.D.N.Y. Aug. 21, 2007) (Rule 12(b)(1)).  In reviewing claims of discrimination or retaliation, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006) (internal quotation marks and citation omitted).  A "pro se complaint is to be read liberally, and should not be dismissed without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks, citation, and italics omitted). However, a party may not amend a pleading through statements made or submitted in motion practice.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006).

# IV.  Discussion

## A.    Federal Claims Against the Department

## 1.    ADA Retaliation

Penc alleges that the Department retaliated against her in violation of the ADA.  (*See* Compl. at 3, ¶ 5, Dkt. No. 1.)  To state a claim for unlawful retaliation under Title V of the ADA, a plaintiff must allege facts permitting at least a reasonable inference that she was retaliated against "*because* [she] has opposed [an] act or practice made unlawful by [the Act] or *because* [she] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Act]."  42 U.S.C. § 12203(a) (emphasis added).  In this case, Penc does not allege that she was retaliated against for any such activity.  Rather, as her complaint and responsive submissions make clear, Penc is claiming that the Department "retaliat[ed] against [her] for reporting security breaches in the Wade Rd. files."  (Compl., at 4, ¶ 7, Dkt. No. 1; *see also id.* at 5, 18, 22, ¶¶ 4A, 132, 184; Pl. Resp. Mem. of Law at 2, 7, ¶¶ 5, VII, Dkt. No. 16.)  This reporting activity, while commendable, is not protected by the ADA and therefore cannot form the basis of an ADA retaliation claim.

Moreover, to the extent that Penc's complaint could be construed to

also allege claims under Titles I and II of the ADA—a construction not urged by Penc—those claims would also be subject to dismissal.

First, it is well established that the Eleventh Amendment bars "[p]rivate individuals [from] claim[ing] monetary damages against a state for violations of ... Title I of the ADA." *Chiesa v. N.Y. State Dep't of Labor*, 638 F. Supp. 2d 316, 321 (N.D.N.Y. 2009) (citing *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)). Here, in suing the New York State Department of Taxation and Finance, Penc has, for Eleventh Amendment purposes, sued the State of New York. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986); *see also Miller v. N.Y. Div. of Tax Appeals*, 480 F. Supp. 2d 574, 581 (E.D.N.Y. 2007) ("The Department of Taxation is a state agency entitled to Eleventh Amendment immunity." (citation omitted)). Thus, because Penc has sued the Department for only monetary damages, no claim under Title I is possible.

Second, with respect to Title II, even assuming its applicability,[4]

_____

[4]As the Department correctly observes, there is an open question as to "whether Title II of the ADA, dealing with the 'services, programs, or activities of a public entity' is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 n.1 (2001) (citations omitted). While other Circuits have addressed the issue, the "Second Circuit has yet to decide whether Title II of the ADA applies to employment discrimination." *Scherman v. N.Y. State Banking Dep't.*, No. 09 Civ. 2476, 2010 WL 997378, at *7 (N.D.N.Y. Mar. 19, 2010) (citations omitted). And to the extent that district courts in this Circuit have weighed in on the issue, their opinions diverge. *See id.* (collecting cases); *compare also, e.g., Chiesa v. N.Y. State Dep't of Labor*,

Penc's allegations fail to give rise to an actionable claim.  To state a claim under Title II of the ADA, a plaintiff must show, among other things, that she "was excluded from participation in, or denied the benefits of some service, program, or activity *by reason of [her] disability*."  *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001) (emphasis added) (citation omitted).  In this case, to the extent that Penc alleges that her history of mental illness played a role in the Department's allegedly unlawful conduct, she claims that it was "used as a ... 'weapon' against 'her' in retaliation for reporting serious security breaches in [the] Wade Road Tax Storage Facility."  (Pl. Resp. Mem. of Law at 7, ¶ VII, Dkt. No. 16.)  Thus, Penc does not allege that she was discriminated against *because of* her mental illness, but instead claims that her mental illness "was used as a *means* of retaliating against [her]" for wholly independent reasons, namely, "for reporting security breaches."  (Compl. at 4, ¶ 7, Dkt. No. 1 (emphasis added).)  Thus, Penc's complaint also fails to state an actionable Title II claim.

_____

638 F. Supp. 2d 316, 321 (N.D.N.Y. 2009) (stating that "a claim of employment discrimination under Title II must fail because of the significant differences in the text between Title I and Title II"), *with Smith v. State Univ. of N.Y.*, No. 1:00-CV1454, 2003 WL 1937208, at *8 (N.D.N.Y. Apr. 23, 2003) (concluding that Title II is applicable to employment discrimination claims despite acknowledging that the Supreme Court "certainly hinted that it was skeptical that Title II would cover such claims").

Accordingly, Penc's complaint is dismissed insofar as it attempts to assert a claim under the ADA.

## 2.   Due Process

Penc also claims that the Department deprived her of her due process rights in connection with the disciplinary proceedings commenced against her, alleging that she was entitled to a more expeditious hearing with respect to her October 2007 NOD, and that the hearings she did receive were a "sham."  This claim too must fail.

While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, ... it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Indeed, as the Supreme Court has made clear, such claims are barred by the Eleventh Amendment.  *See id.* at 66.  Further, this "Eleventh Amendment [immunity] extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citations omitted).  Thus, because the "[t]he Department of Taxation is a state agency entitled to [such] immunity,"  *Miller*, 480 F. Supp.

18

2d at 581, Penc's §1983 due process claim must be dismissed.

**B.   Claims Against CSEA Defendants**

As noted above, Penc asserts claims against the CSEA defendants alleging that "[she] was ignored when [citing] CSEA contract violations to [them]"; that "no remedies or actions were sought" in that regard; and that "CSEA Reps ignor[ed] ... and fail[ed] to represent [her] when [she] refused plea deal."  (Compl. at 6-7, ¶¶ 1B-2C, Dkt. No. 1.)  Penc further alleges a "violation of [her] expeditious right to due process," and that the CSEA engaged in a "plot ... to isolate her in the cafeteria reception booth beginning 12/17/200[7] - June 4, 2008."  (*Id.* at 7, ¶¶ 3C-4C.)

Though not specifically denominated as such in her complaint, Penc's allegations assert claims for breach of the CSEA's duty of fair representation (DFR).  *See Herington v. Civil Serv. Emp. Assoc., Inc.*, 130 A.D.2d 961, 961-62 (4th Dep't 1987) (recognizing that union member "has no cause of action against [her] union either for breach of contract or for negligence arising out of the performance of duties assumed under the collective bargaining agreement; [her] sole remedy is an action for breach of fair representation" (citations omitted)); *see also, e.g.*, *Clissuras v. New York*, 131 A.D.2d 717, 718 (2d Dep't 1987) (explaining that "[a]lthough the

19

plaintiff ... characterized her causes of action as involving fraud, conspiracy, breach of contract, breach of fiduciary duty and negligence," her allegations that the union improperly calculated her pension benefits were "in essence a claim for breach of the duty of fair representation"). These claims fail for at least two reasons.

First, because Penc is a public employee, her DFR claims are governed by New York State law, and she may not maintain an action or invoke federal jurisdiction under the "[Labor Management Relations Act] or any other federal statute." *Giardina v. Nassau Cnty.*, No. 08-CV-2007, 2009 WL 910386, at *9 (E.D.N.Y. Mar. 31, 2006); *see also Ford v. D.C. Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (explaining that public employees are not covered by the Labor Management Relations Act or the National Labor Relations Act). Thus, because the court has already dismissed Penc's complaint to the extent it asserts federal claims, the court lacks original subject matter jurisdiction over Penc's DFR claims. And given the dismissal of Penc's federal claims at this very early stage of the litigation, the court declines to exercise its supplemental jurisdiction as to Penc's state law DFR claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction where it has

dismissed all claims over which it has original jurisdiction); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Second, even if the court were to exercise its supplemental jurisdiction, Penc's claims would nonetheless fail.  "Under New York state law, a claim against a union for violating the duty of fair representation is subject to a four-month statute of limitations." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69-70 (2d Cir. 2006) (citing, inter alia, N.Y. C.P.L.R. § 217(2)(a)).  This limitations period runs from either "the date the employee ... knew or should have known that the breach has occurred, or ... the date the employee ... suffers actual harm, whichever is later." N.Y. C.P.L.R. § 217(2)(a).  In this case, each of Penc's allegations of union misconduct is insufficient to comprise the basis of a timely DFR claim.

Penc alleges that CSEA Representatives Mike Gifford and Lois Biette, "did little" at her October 12, 2007 interrogation "to prevent [her interrogators] from verbally assaulting [and] attacking [her]."  (Compl. at 21, ¶ 182, Dkt. No. 1.)  Clearly, Penc knew at the time of her interrogation—

which occurred more than eighteen months prior to commencing this action—that Mr. Gifford and Ms. Biette failed to adequately defend her against these alleged verbal assaults.  Similarly, even if accrual is measured from October 24, 2007, the day Penc received the notice of discipline relating to the charges precipitating the interrogation, this action was still commenced far beyond the four-month statute of limitations. Accordingly, to the extent Penc's allegations as to Ms. Biette and Mr. Gifford's alleged inadequate representation is intended to comprise the basis of a DFR claim, the claim is time-barred and must fail.

Penc also alleges that her CSEA representation was deficient because she was not afforded a hearing within thirty days of demanding one in connection with her October 2007 notice of discipline.  To the extent that the CSEA may have breached its duty with respect to ensuring  Penc received a timely hearing, Penc clearly knew no later than November 26, 2007—thirty-one days after she requested the hearing—that such a breach had occurred.  Thus, because more than four months had passed before Penc commenced the current action, this allegation is also insufficient to assert a timely DFR claim.

The same is true of Penc's allegations with respect to being denied

22

replacement counsel when she suspected that "Mr. Rylewicz was not allowing [her] the expedited hearing per the CSEA contract." (*Id.* at 24, ¶ 203.)  According to Penc's complaint, this denial, which Penc was clearly aware of, occurred prior to December 2007 and therefore more than four months prior to the commencement of this action. (*See id.* at 24, ¶¶ 202-08).

Penc's allegations that the CSEA engaged in a "plot ... to isolate her in the cafeteria reception booth beginning 12/17/200[7] - June 4, 2008," (*id.* at 7, ¶¶ 3C-4C), fares no better.  Initially, this allegation is wholly unsupported by any facts alleged in Penc's complaint.  Moreover, even assuming Penc was being "isolated" during that time period, she clearly was aware of it at that time, which was nearly two years prior to the commencement of this action.

As to Penc's allegations that "[she] was ignored when [citing] CSEA contract violations to [the CSEA]" in August 2008, and that "no remedies or actions were sought" in that regard are also insufficient to state a timely claim.  Put simply, presuming Penc's concerns were ignored and no action was taken, the court finds it unreasonable to conclude that Penc did not know or should not have known of that fact more than four months prior to

the commencement of this action.  Accordingly, that Penc's August 2008 concerns may have been "ignored" fails to supply the requisite basis for a timely DFR claim.

Penc further alleges that "CSEA Reps fail[ed] to represent [her] when [she] refused a plea deal"; and "ignor[ed  her] after she refused a deal." (*Id.* at  6-7, ¶¶ 1B-2C.)  According to the complaint, the only "plea deal" Penc "refused" is the "recommended proposal of a four week suspension without pay" in connection with the October 2007 notice of discipline.  (*Id.* at 23, ¶¶ 194-95.)  To the extent that Penc alleges that Mr. Gifford ignored and failed to represent her when she decided to not take the deal on October 26, 2007, (*see id.* at 23, ¶¶ 197-98), that refusal and the alleged breach stemming therefrom would have been apparent to Penc at that time.  Similarly, to the extent that Penc bases her allegation of being "ignored" and "not represented" in connection with not being afforded a timely hearing, that allegation, for the reasons discussed above, would also fail to supply an adequate basis for a timely DFR claim.    And finally, to the extent that Penc relies on her allegation that Mr. Rylewicz coerced, pressured, or intimidated her to take the September 2008 "settlement offer," or that he refused to have the agreement revoked once made, that

24

reliance is misplaced since it is clear that Penc was aware of this allegedly wrongful conduct when it occurred, which was more than eighteen months prior to the commencement of this action.

Accordingly, for all of these reasons, Penc's claims against the CSEA defendants are dismissed.

## C.  **State Claims Against the Department**

Penc's remaining claims against the Department for defamation, and for violating the "tax codes of conduct," to the extent cognizable, do not arise under federal law.  Thus, having already dismissed Penc's federal claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction as to these remaining state claims and as to Penc's complaint to the extent it may otherwise assert claims based on state law.  *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.

## V.  **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motions to dismiss (Dkt. Nos. 15, 18) are **GRANTED** and Penc's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties by regular and certified mail.

**IT IS SO ORDERED.**

May 24, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge